AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br><br>Net Proceeds due to the Seller(s) of the Real Property located<br>at 9397 Ridings Boulevard, Centerville, Ohio 45458 | )<br>)<br>)<br>)<br>)<br>) |

Case No.  MICHAEL J. NEWMAN

*FILED*
*RICHARD W. NAGEL*
*CLERK OF COURT*
2018 DEC 19  AM 9: 43
U.S. DISTRICT COURT
SOUTHERN DIST OHIO
3:18 mj 813

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Southern_____ District of _____Ohio_____ is subject to forfeiture to the United States of America under _____18_____ U.S.C. § _____981(a)(1)(A) and (C)_____ *(describe the property)*: and 28 U.S.C. §2461(c) and 18 U.S.C.§ 2428.

The application is based on these facts:

　　See attached Affidavit

☑ Continued on the attached sheet.

_____
*Applicant's signature*

　　Kenny D. Howard, S.A. Federal Bureau of Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __12/19/18__

_____
*Judge's signature*

City and state: __Dayton, Ohio__

　　Michael J. Newman, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Kenny D. Howard, being duly sworn, depose and state:

### I. INTRODUCTION

1.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since May 2018. I am currently assigned to the Dayton Resident Agency of the Cincinnati Field Division. I presently am assigned to work a variety of criminal and national security matters, including the investigation of violent crimes and major offenses such as federal bank robberies and the apprehension of federal fugitives. Prior to my employment with the FBI, from January 2011 through May 2018, I was a Fraud Investigator with the Ohio Auditor's Office. While employed with the Ohio Auditor's Office, I was assigned to the FBI Southern Ohio Public Corruption Task Force, from March 2016 through May 2018. I obtained my Bachelor of Arts in Accounting, from Wilmington College, Ohio. Prior to my employment with the FBI I was a Certified Fraud Examiner.

2.      As a special agent, I have received training in the investigations of white collar crimes, including bank fraud, mail fraud, wire fraud, embezzlement, and money laundering. I have participated in the investigation of financial crimes involving, among others things, employee embezzlement from federally insured financial institutions and other commercial businesses. I have participated in the execution of search and seizure warrants involving financial crimes and have interviewed individuals that have perpetrated frauds against businesses and banks.

3.      During my employment with the Ohio Auditor's Office and during my assignment to the FBI Southern Ohio Public Corruption Task Force, I have conducted and participated in many investigations involving violations of the United States laws and the State of Ohio laws relating to theft, fraud and money laundering. I have participated in the execution of numerous federal and state search warrants in such investigations. I have extensive training in many methods used to commit theft, fraud and money laundering.

4.      Based on my training, experience and participation in financial investigations, and based upon the experience and knowledge of other agents and officers who were involved in the investigation from its onset, I know:

      a.      That individuals who receive funds from a particular crime will attempt to legitimize the proceeds of the crime by depositing the funds into bank accounts in nominee names. These individuals will often launder the funds through these nominee bank accounts in an attempt to further conceal the disposition of the funds.

      b.      That individuals who receive funds from a particular crime will attempt to conceal the disposition of these funds by purchasing personal assets with cash. These individuals use, control and maintain these assets in their residences and businesses and will maintain receipts from these assets in their residences and businesses. These documents include car titles and deeds, other documents relative to large equipment.

   c.  If an individual has removed bulk currency from a bank, it tends to come banded (i.e., in a money strap or band). After removing money from the bank, the individual often retains the band on the currency until the currency is accessed.

   d.  In the modern era, people bank online, conduct transactions online, make travel arrangements, access to overseas banks and check credit card statements on line.

   e.  When individuals obtain crime proceeds, particularly in the form of US currency, they are unlikely to deposit all of it into bank accounts for fear of alerting authorities. As such, these individuals often keep bulk currency at their residence or businesses, in safes, vehicles, etc.

5.  This affidavit is intended to include facts to support the seizure of the Net Proceeds due to the Sellers of the Real Property located ats 9397 RIDINGS BLVD, CENTERVILLE OHIO 45458 and does not purport to set forth all of my knowledge of, or investigation into, this matter. The facts and information contained in this affidavit are based on, among other things, my personal knowledge, my training and experience, as well as my conversation with various witnesses, including law enforcement personnel who have participated in this investigation, and the review of certain documents and records. Most notably, this affidavit does not set forth every transaction conducted in this case.

## II. PURPOSE OF AFFIDAVIT

6.  I make this affidavit in support of:

   a.  the seizure of the following asset:

  (1) **Net Proceeds due to the Seller(s) of the Real Property located at 9397 Ridings Blvd, Centerville Ohio, 45458**, pictured below, more specifically described as:

   Situate in Sections 17 & 23, Town 3, Range 5, MRs, in the Township of Washington, County of Montgomery, State of Ohio, being Lot Numbered SEVEN (7) The Trails of Saddle Creek, Section 1 as recorded in Plat Book "206", page(s) 28-28B of the Plat Records of Montgomery County, Ohio.

   Auditor Parcel No: O67-223-42-7





b.  as there is probable cause to believe the following individuals/entities:

    (1)    LISA THOMAS; the owner of:



    a.  JAN'S GROOMING, (Sole Proprietorship/Pet Grooming);

    b.  DISCREET LEE, (Sole Proprietorship/Escort Services);



(2)      and GEORGE HELMS;



c.      were involved in one or more of the following violations;

(1) 18 U.S.C. § 2422(a) (Mann Act);

(2) 18 U.S.C. § 1956 (Money Laundering);

(3) 18 U.S.C. § 1957 (Money Laundering (Spending));

(4) 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering); and

(5) 26 U.S.C. § 7201 (Tax Evasion);

(6) 26 U.S.C. § 7202 (False Tax Return);

(7) 26 U.S.C. § 7203 (Failure to File, Pay Tax);

d.      and the proceeds are subject to forfeiture pursuant to:

(1) 18 U.S.C. § 981(a)(1)(C)(civil forfeiture) as property, real or personal which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity" ("SUA") as defined in 18 U.S.C. § 1956(c)(7) which includes a violation of 18 U.S.C. § 2422(a)(Mann Act); 18 U.S.C. § 1956 (Money

Laundering), 18 U.S.C. § 1957 (Laundering SUA Proceeds in Excess of $10,000.00); or a conspiracy to commit such offense;

(2)  18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)(criminal forfeiture) as property, real or personal which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7) which includes a violation of 18 U.S.C. § 2422(a)(Mann Act); 18 U.S.C. § 1956 (Money Laundering), 18 U.S.C. § 1957 (SUA Transactions in Excess of $10,000.00); or a conspiracy to commit such offense ;

(3) 18 U.S.C. § 2428(a)(1) (criminal forfeiture) as property, real or personal that was used or intended to be used to commit or to facilitate the commission of a violation of 18 U.S.C. § 2422(a);

(4) 18 U.S.C. § 2428 (a)(2) (criminal forfeiture) as property, real or personal, constituting or derived from any proceeds that such person obtained, directly or indirectly, as a result of a violation of 18 U.S.C. § 2422(a);

(5) 18 U.S.C. § 2428(b)(1) (civil forfeiture) as property, real or personal used or intended to be used to commit or to facilitate the commission of a violation of 18 U.S.C. § 2422(a); and/or

(6) 18 U.S.C. § 2428(b)(2) (civil forfeiture) as property, real or personal, that constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 2422(a).

7.      This affidavit is intended to show only that there is sufficient probable cause for the seizure of the Net Proceeds due to the Seller(s) of the Real Property located at 9397 Ridings Boulevard, Centerville, Ohio 45458 and does not purport to set forth all of my knowledge of, or investigation into, this matter. The facts and information contained in this affidavit are based on, among other things, my personal knowledge, my training and experience, as well as my conversations with various witnesses, including law enforcement personnel who have participated in this investigation, and the review of certain documents and records.

## III.  VIOLATIONS

### A.  SUMMARY OF THE VIOLATIONS

8.      The investigation has revealed that GEORGE HELMS paid LISA THOMAS just under $2.5 million dollars between 2007 and March 2016 in exchange for her interstate travel to Michigan to engage in illegal sexual activity in violation of the Mann Act. HELMS and THOMAS also engaged in money laundering by conducting financial transactions with the proceeds of HELMS' payments, in order to conceal or disguise the nature, source and ownership of the proceeds and to promote the carrying on of the illegal activity.

9.      HELMS and THOMAS created a sham Limited Liability Company called R BOULEVARD PROPERTIES, LLC (hereinafter "RIDING LLC") to conceal the payments to

THOMAS for her "exclusive escort services", and to allow HELMS to pay THOMAS for her "exclusive escort services" without his wife finding out. HELMS and THOMAS then caused RIDING LLC to purchase the house at 9397 RIDINGS BLVD, using $925,000 of the proceeds HELMS paid THOMAS for her "exclusive escort services". THOMAS referred to the residence in the *Helms v. Thomas* litigation as their "Love Nest". (*Helms v. Thomas, et. al.*, Montgomery County Common Pleas Court Case No: 2016CV03740.)

10.     HELMS also paid THOMAS roughly $30,000 a month to travel to Michigan to provide her "exclusive escort services", i.e., engage in prostitution. HELMS transferred approximately $30,000 a month into the sham LLC to conceal or disguise the nature, source and ownership of the proceeds. THOMAS withdrew payments out of the LLC's account to pay for personal expenses such as paying off the loans on her Porsche and the Mercedes purchased for her daughter. Finally, THOMAS failed to report the approximately $2.5 million dollars she received from HELMS on her tax returns.

11.     This case is related to a pending federal murder case, *United States v. Sterling Roberts*, (SDOH/Dayton, Case No: 3:18CR0032). In the *Roberts* case, THOMAS' sister (CHANDRA HARMON) and niece (TAWNEY CALDWELL) are charged with violations related to the murder of Robert Caldwell. Robert Caldwell is TAWNEY CALDWELL'S ex-husband and the father of her three sons.

12.     Robert Caldwell was shot and killed by STERLING ROBERTS, the father of TAWNEY CALDWELL'S two toddler aged girls. STERLING ROBERTS shot Caldwell when Caldwell was taking his and TAWNEY CALDWELL'S sons to their counseling session. Counseling had become necessary due to the acrimonious child custody proceedings. The murder occurred in the parking lot in the presence of all three boys.

13.     Shortly after the murder, one boy, who was approximately 14 years of age, went missing. After one year and a reward being, the missing boy was found hiding in the house of one of THOMAS' employees. That employee worked for THOMAS at JAN'S PET GROOMING, a business which THOMAS appears to be using to disguise her income from prostitution. THOMAS' employee is not a United States citizen and has been in the country illegally.

### B. MANN ACT VIOLATIONS

14.     The Mann Act, Title 18, Section 2422(a), prohibits inducing or enticing another person to travel in interstate or foreign commerce to engage in prostitution or unlawful sexual activity.

15.     There is probable cause to believe that HELMS induced and enticed THOMAS to travel in interstate and foreign commerce, i.e., to Michigan, China, and other locations outside Ohio and the United States, to engage in prostitution or sexual activities for which a person can be charged with a criminal offense, in exchange for the HELMS' payments of approximately $1,709,876.41 which includes $925,000 for the purchase of 9397 RIDINGS BLVD recorded on October 30, 2013 in the name of R BOULEVARD PROPERTIES, LLC, and payments of approximately $30,000 a month for THOMAS' "exclusive escort services" during the period of November 2013 through February 2016.

16.     HELMS induced and enticed THOMAS to travel in interstate or foreign commerce to engage in illegal sexual activities by paying her approximately $2.5 million dollars.

17.     When HELMS first met THOMAS, she was already providing escort services. THOMAS started providing escort services in the Dayton, Ohio and surrounding areas in 2007.

18.     THOMAS advertised her services on the EROS website. The following picture depicts a screen shot from the website:



19.    According to her website, LISA THOMAS advertises herself as follows:

I am undoubtedly a unique individual, sophisticated yet uncomplicated. I love living an atypical life with an optimistic open mind. Being in my thirties, I have enough life experience to know what I desire and I continue to enjoy all there is to be desired.  I am sexy, seductive and uninhibited. My charismatic flirtatious disposition is sure to allow you comfort and relaxation soon after we meet.

I am very health conscious, maintaining a healthy lifestyle and a regular exercise agenda that contributes to my toned figure.  With my silky long blond hair, captivating blue eyes and a smile that lights up a room, I certainly will ignite your passion. My appearance is sexy while always displaying elegance.

If you are a discerning gentleman who appreciates the company of a well-traveled, intelligent woman, who is also fun and affectionate, then I may be for you. Escape the ordinary, and experience the extraordinary.

20.    As depicted below, LISA THOMAS advertised "So much more than a GFE".



21.    Your Affiant knows that "GFE" stands for "Girl Friend Experience" and that means sex.

22.    THOMAS advertised that her services are only available to "Men".

23.    THOMAS advertised her rates as $550 for an hour and $1,000 for 2 hours.

24.    THOMAS advertised that she accepted "donations" in connection with her hourly rates of $550 an hour and $1,000 for 2 hours. THOMAS has not registered her "escort" business as a 501(c)(3) non-profit organization. Thus, the use of the term "donations" appears to be an attempt to distance her "escort" services as an exchange of money for sex.

25.    On Valentine's Day weekend in 2009, LISA THOMAS was arrested for two Counts of Prostitution. Count One charged Soliciting for Prostitution in violation of ORC 2307.24A. Count Two charged Prostitution in violation of ORC 2307.25.

26.    These charges against THOMAS arose out of a sting operation during which she solicited Detective R. Stevens to engage in sexual activity for hire, i.e., GFE, Girl Friend Experience, Sex, or Intercourse for $550.00 and engaged in sexual activity for hire by grasping the detective's genitals for sexual gratification for $550.00.

27.    According to Detective Stevens' report, during the sting operation, he responded to an escort advertisement on www.erosguide.com. LISA THOMAS was advertising as Discreet Lee. The report states:

> In the ad [LISA THOMAS] advertised "So much more than a GFE." GFE is a term meaning "girl friend experience" which generally means that sexual acts would be performed such as intercourse, masturbation and/or oral sex. [LISA THOMAS] advertised her fees as $550 hr. / $1000 2 hrs. Det. Stevens responded to the ad.[LISA THOMAS] advised that she had a dinner engagement and would not be available. [LISA THOMAS] required that Det. Stevens provide her with references from past girls he had seen. Det. Stevens provided names and information of others advertising. **[LISA THOMAS] advised she had to make sure Det. Stevens was not law enforcement.** [LISA THOMAS] advised that she would call Det. Stevens the next day (2-17-09) if she could arrange a time to see him. On 2-17-09, [LISA THOMAS] phoned Det. Stevens sometime between 11am- 12pm. [LISA THOMAS] advised that she could see Det. Stevens if he was still interested. [LISA THOMAS] stated she would be in Columbus between 3:15pm – 3:30pm. Throughout the conversation, [LISA THOMAS] assured that she provided the GFE experience and her session was $550 hr. Det. Stevens agreed to the appointment. Det. Stevens provided [LISA THOMAS] with the hotel information, …, room #161. Det. Stevens was informed that [LISA THOMAS] did call the front desk confirming that he was registered and provided her with the correct information. [LISA THOMAS] again phoned Det. Stevens at 3:12pm and advised she was close and would arrive momentarily. At 3:20pm, Det. Stevens answered the door of room #161. Det. Stevens greeted [LISA

THOMAS] as she entered the room. [LISA THOMAS] asked if she could use the bathroom. Det. Stevens sat on the bottom of the bed. [LISA THOMAS] exited the bathroom and sat beside Det. Stevens. A brief conversation took place with [LISA THOMAS] asking multiple questions. [LISA THOMAS] stood stating she was going to get comfortable and advised Det. Stevens to do the same. [LISA THOMAS] undressed down to her bra and panties. Det. Stevens undressed down to his underwear. Both lay on the bed and [LISA THOMAS] began rubbing Det. Stevens' arms and legs. [LISA THOMAS] eventually grasps Det. Stevens' genitals for sexual gratification. Det. Stevens immediately stopped [LISA THOMAS'] actions by stating that he had to use the bathroom. At 3:42pm Det. Stevens exited the bed and entered the bathroom. Detectives entered the room placing [LISA THOMAS] under arrest for 2307.24A Soliciting and 2307.25 Prostitution.

28.     Your Affiant notes that there is no need to determine if a customer is "law enforcement" if your "escort" business is providing a lawful service.

29.     On January 5, 2010, LISA THOMAS plead guilty to a reduced charge, ORC 2917.11, Disorderly Conduct.

30.     While this criminal action was pending, the following negative reviews for her services was posted:

ezDillsborodave 03·'.31·09. 15:5O
Harpo reply
[QUOTE=Harpo2u]Hey Dill,
Welcome, what about discreet Lee? I looked up her web site and thought 5.50 an hour is way to much for this area. Also saw a review that wasn't good about her. There are plenty of younger and hotter babes that you can get for 2.50 to 3.0 an hour.

There is a provider in Covington, KY called Paige Turner and you can find her on Eros. Plenty of good reviews. We all miss the AMP's.

Harpo2U[/QUOTE]I agree, that is way too much. **I orginally was introduce by her sister who I met through an escort service in Dayton back in the 90's. Lee took over her sisters clients.** Back then she just charged me two as a friend discount but now she wants more. We were both younger back then but she is a little pricey for her age. I think they all overprice on thier websites. Was told by an escort that you can always lower a price for a client but hard to raise. Thanks for the Paige Turner info. I see Haily Sparkles fairly regular now.

Nkykinkyguy
Whitney
04-01-09, 14:56 (Emphasis added.)

31.     From 2007 until early 2016, when their relationship ended, LISA THOMAS provided escort services to HELMS.

32.     During the period of 2007 to 2016, HELMS was married. HELMS had no need of hiring a woman simply to attend functions or provide companionship because he had a wife and children.

33.     HELMS' relationship with THOMAS ended in early 2016, shortly after HELMS' wife filed for divorce. The divorce proceedings were filed in Michigan, the HELMS' state of residence.

34.     After HELMS' wife filed for divorce, HELMS stopped paying THOMAS $30,000 per month. THOMAS stopped providing escort services to HELMS.

35.     HELMS contacted THOMAS about selling 9397 RIDINGS BLVD and on March 8, 2016, they signed a contract to list the property for sale for $1,150,000. However, THOMAS refused to move out of the property or cooperate with the broker. When an offer of $900,000 was received in June 2016, THOMAS refused to accept the offer. Consequently, in July 2016, HELMS sued THOMAS in Montgomery County Common Pleas Court to dissolve R BOULEVARD PROPERTIES LLC, and sell its sole asset, the real property at 9397 RIDINGS BLVD. (*Helms v. Thomas, et. al.*, Montgomery County Common Pleas Court Case No: 2016CV03740.) The Court records provide insight into the relationship between HELMS and THOMAS.

36.     HELMS alleged in the Complaint that:

   a.   He "previously had a personal relationship" with THOMAS which "began when HELMS paid THOMAS for her services as a high-end escort offering more than the girlfriend experience";

   b.   He "paid THOMAS for such services and further provided her gifts, including money";

   c.   He and THOMAS "formed R. BOULEVARD PROPERTIES, LLC, which was formed for the purpose of acquiring, developing and/or managing real property located in Montgomery County, Ohio";

   d.   The transaction with R. BOULEVARD PROPERTIES, LLC "was not a payment for escort services and was not a gift, but rather was a business venture to buy and trade real estate."

   e.   He and THOMAS are each fifty percent (50%) members of the Ohio limited liability company known as R. BOULEVARD PROPERTIES LLC;

      f.  He contributed approximately $1,709,876.41 in cash to R. BOULEVARD PROPERTIES, LLC for the purchase, furnishing, utilities, maintenance, taxes and repair of certain real property in Montgomery County, Ohio.

37.     HELMS alleged various theories for relief and requested an order dissolving the LLC, selling the property owned by the LLC, 9397 RIDINGS BLVD, and as the sole contributor of capitol to the LLC, that he be awarded the full proceeds of the sale of 9397 RIDINGS BLVD.

38.     HELMS attached an unsigned Operating Agreement for R BOULEVARD PROPERTIES, LLC to the Complaint. That Operating Agreement vaguely provides that the business purpose of the company is to: "engage in any lawful business permitted by the Act or the laws of any jurisdiction in which the Company may do business."

39.     The day after filing the Complaint, HELMS filed a Motion for a Temporary Restraining Order (TRO). At that time he alleged that not only had he contributed $1,709,876.41 for the purchase, furnishing, utilities, maintenance, taxes and repair of 9397 RIDINGS BLVD, he subsequently had contributed an additional $759,876.41 to the LLC'S bank account.

40.     THOMAS responded to the Motion for the TRO by challenging the proper purpose of the LLC. THOMAS argued that 9397 RIDINGS BLVD was purchased merely as a "love nest" or gift to her. The TRO was denied.

41.     THOMAS answered HELMS' Complaint and filed a Counterclaim alleging:

      a.  HELMS hired her as an escort;

      b.  Their relationship "was a business relationship in which HELMS paid THOMAS compensation in exchange for her escort services";

      c.  Prior to October 2013, THOMAS did not provide escort services exclusively to HELMS, but rather provided escort services to a number of other clients;

      d.  In July 2012, HELMS purchased a ML350 Mercedes SUV for THOMAS' daughter;

      e.  In December 2012, HELMS purchased a Porsche Cayenne Turbo for THOMAS;

      f.  In August 2013, HELMS purchased a horse for THOMAS' daughter;

      g.  HELMS was jealous and angered by the fact that THOMAS provided escort services to other males;

      h.  HELMS and THOMAS came to an agreement that HELMS would give THOMAS a home and a lifetime of financial support in exchange for her exclusive escort services;

i.  HELMS formed R BOULEVARD PROPERTIES, LLC to carry out the agreement and to hide his agreement from his wife; there was no intent to start any business or investment;

j.  HELMS purchased the house at 9397 RIDINGS BLVD through R BOULEVARD PROPERTIES, LLC which he gave to THOMAS in exchange for her exclusive escort services;

k.  On September 21, 2013, HELMS sent a text message to THOMAS stating: "What are you doing today? No Rolls yet had to put it on hold while [I] buy my lover a house!!!!

l.  The purchase of the home and the creation of the LLC was for the purpose of making direct payments to THOMAS [for] her services and/or was a voluntary gift;

m.  On January 28, 2014, HELMS sent a text message to THOMAS stating in reference to the LLC account, "Your Money is in Your Account";

n.  "The LLC also had the purpose of concealing THOMAS' identity from his wife and conceal the payments to THOMAS under the agreement";

o.  "The LLC further had the purpose of avoiding the gift tax consequences of paying THOMAS directly;

p.  On October 10, 2013, HELMS sent a text message to THOMAS stating: "If putting money in the LLC is an issue we can pay it directly! I am worried that it might create a gift tax for me!";

q.  "R BOULEVARD PROPERTIES LLC never bought, sold, or otherwise engaged in a for profit real estate business during its entire existence";

r.  "The only money deposited or withdrawn under the LLC account was for the payment of LISA THOMAS' exclusive escort services under the agreement";

s.  "From November 2013 to march 2016, HELMS deposited approximately $30,000 per month into the LLC account for payment to LISA THOMAS under their agreement";

t.  HELMS only visited 9397 RIDINGS BLVD one time for 10 minutes in March 2014;

u.  THOMAS continued to abide by her obligations under the agreement by providing exclusive escort services to HELMS and received consistent payment from HELMS from November 2013 to March 2016;

v.  In January 2016, HELMS moved out of his Michigan home and separated from his wife;

w.  HELMS' wife filed for divorce on February 9, 2016;

x.  HELMS ceased making payments to THOMAS around March 2016.

42.  THOMAS alleged that HELMS breached their contract, because although she provided "exclusive escort services" to HELMS:

a.  HELMS stopped making payments to her in March 2016; and therefore,

b.  HELMS owed her the Fair Market Value of the 9397 RIDINGS BLVD house ($1,150,000), plus $12,300,000 ($30,000 per month for her remaining 34 year lifetime) for breaching their contract.

## THE THOMAS FAMILY ESCORT BUSINESS

43.  LISA THOMAS' sister is CHANDRA HARMON.  According to one reviewer of THOMAS' escort services, THOMAS took over her sister's clientele.

44.  LISA THOMAS is the Aunt of TAWNEY CALDWELL (THOMAS), pictured below. TAWNEY CALDWELL'S mother is LISA THOMAS' sister, CHANDRA HARMON.



45.  TAWNEY CALDWELL took up the family business, advertising her own escort service using the website www.yoursunshinetoday.com, and the name "chrissylane".

Page **15** of **35**

46.     TAWNEY CALDWELL offered the same rates: $550 – 1 hour, and $1,000 – 2 Hours.  In addition, TAWNEY CALDWELL advertised $5,000 – Overnight.



47.     TAWNEY CALDWELL copied her Aunt's advertisement almost verbatim stating:

I am undoubtedly a unique individual, sophisticated yet uncomplicated. I love living an atypical life with an optimistic open mind! Being in my late twenties, I have enough life experience to know what I desire and I continue to enjoy all there is to be desired.  I am sexy, seductive and uninhibited, *all while remaining discreet*. My charismatic flirtatious disposition *combined with stimulating conversation* is sure to allow you comfort and relaxation soon after we meet. …

I am very health conscious, maintaining a healthy lifestyle and a regular exercise agenda that contributes to my toned figure.  With my silky long blond hair, captivating blue eyes and a smile that lights up a room! I certainly will ignite your passion! My appearance is sexy while always displaying elegance.

If you are a discerning gentleman who appreciates the company of a well-traveled, intelligent woman, who is also fun and affectionate, then I *am the one* for you. Escape the ordinary. and experience the extraordinary!

(Italics indicate the differences in THOMAS' and TAWNEY'S advertisements.)



48.  TAWNEY CALDWELL was married to Robert Caldwell and had three boys with Robert Caldwell.

49.     TAWNEY CALDWELL got into a relationship with STERLING ROBERTS, pictured below, and had two girls with STERLING.



50.     Shortly after Robert Caldwell obtained custody of the three boys, Robert Caldwell was shot and killed on August 15, 2017, in front of the boys.

51.     TAWNEY CALDWELL and STERLING ROBERTS have been indicted in federal district court in the Southern District of Ohio at Dayton, in *United States v. Sterling Roberts, et al.*, Case No: 3:18CR032 (SD Ohio) on several charges, including killing Robert Caldwell through the use of a firearm in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and (j) and 2.

52.     CHANDRA HARMON was also indicted in *United States v. Sterling Roberts, et al.*, Case No: 3:18CR032 (SD Ohio) on the charge of aiding and abetting and using intimidation, threatened and corruptly persuading another person, or attempting to do so, and engaging in misleading conduct toward another person with intent to influence, delay, and prevent the testimony of any person in an official proceeding with regard to the evidence related to the killing of Robert Caldwell through the use of a firearm in violation, in violation of 18 U.S.C. § 1512(b) and 2.

53.     Both TAWNY CALDWELL and STERLING ROBERTS are in prison awaiting trial.

54.     A few days after Robert Caldwell's murder, one boy (identified herein as "J.C.") ran away and was missing for over a year.

55.     After being missing for over one year, the boy was found at the home of an employee of LISA THOMAS' dog grooming business.

56.     TAWNEY CALDWELL'S and Robert Caldwell's three boys were placed in the custody of Robert Caldwell's mother the night he was murdered.

57.     LISA THOMAS and STACI THOMAS, pictured below, the daughter of LISA THOMAS, took custody of TAWNY CALDWELL'S two daughters.



58.     With TAWNEY CALDWELL in jail, TAWNEY'S mother CHANDRA HARMON indicted in relation to the murder of the boys' father, and LISA THOMAS embroiled in civil litigation over the ownership of 9397 RIDINGS BOULEVARD, which she claimed as the proceeds of her "escort" business, STACI THOMAS became the logical person on the maternal side to seek custody of TAWNEY'S boys.

59.     STACI THOMAS is TAWNEY CALDWELL'S cousin.

60.     STACI THOMAS has always been financially dependent on LISA THOMAS. STACI relied on LISA THOMAS to pay for her seven years of college. STACI has lived with LISA THOMAS since graduating from college. STACI planned to continue living with LISA THOMAS if given custody of the boys. Consequently, both LISA THOMAS and STACI THOMAS were cross examined at the June 2018 custody hearing for the boys.

61.     LISA THOMAS' testimony at the boys June 20, 2018 custody hearing reveals further details on her "escort" business, her relationship with HELMS, and her income.

62.     THOMAS testified as follows:

        a.  She owns Jan's Grooming, a sole proprietorship. (32-33.)

        b.  She is 50. (34.)

        c.  She was being evicted from a rental house on Social Row Road in Centerville. (34.)

d.  She is part owner of 9397 RIDINGS BLVD, which is in a LLC. (37.)

e.  She has had sex with HELMS on more than one occasion during their 10 year relationship. (39.)

f.  She has been an escort. (40-41.)

g.  She provided escort services to HELMS beginning in 2007. (43.)

h.  Prior to September 2013, she also provided escort services to other clients in addition to HELMS. (43-44.)

i.  She could not remember the names of any of those other clients. (44.)

j.  She tried to avoid testifying to her escort business averring:

> A.  I, I don't really see that getting into the litigation of my other case. I've acknowledged that I was an escort previously. Being an escort, I would escort people. I did not have sex all the time. I may have had sex if I was in a relationship with someone so I can't just make a blanket statement of oh, I had sex with everyone I ever had a client with or I never had sex with anyone that was a client of mine. It wasn't sex. I've gone on trips. I've been to dinner. I've done different things. (45.)
> …
> Q. Did you have sexual relations with any of your clients that you provided escort services to? One of them, ten of them? I don't care. Did you have sexual relationships with any of your escort clients when you were providing escort services?
> A. I have had sex before.
> Q. Okay. And in exchange for your escort services, you received a fee for those services, correct?
> A. A fee for their --- my services if I had sex or didn't have sex.
> Q. Okay. **So** sex sometimes was a part of it. Sex was sometimes not a part of it. I understand. Is that – is that correct?
> A. Yeah, I guess that could be correct.
> Q. Okay. So George Helms was paying you $30,000 a month –
> A. uh-huh.
> Q. – for your escort services?
> A. Yes.
> Q. And again, those escort services during the period of time in which he was providing you $30,000 a month for compensation for your escort services sometimes included sex, sometimes didn't?
> A. Sometimes I didn't see him for months, yeah.
> Q. Okay. That's a good deal. You were paid the $30,000 to provide exclusive escort services for just George Helms, correct?
> A. Correct.

k.  HELMS purchased the house at 9397 Ridings Boulevard and put it into the LLC. (47-48.)

l.  HELMS "allotted me the money, and what I did with the money was mine." (48.)

m.  She is currently employed by Jan's Grooming, earning $50,000 a year. (55.)

n.  STACI makes about $50,000 a year from Jan's Grooming. (56.)

o.  The check she gave for the rental house on Social Row Road bounced. (61.)

p.  She employs Ronda, Zach and Joanne, but could not remember their last names. (64.)

q.  She denies that Jan's Grooming is a front for her prostitution and escort business. (64.)

r.  She could not remember how much Jan's Grooming brought in in 2017. (64.)

s.  HELMS purchased the Mercedes ML350 SUV STACI drives and she paid the loan payments. (66, 68, 70.)

t.  HELMS paid for STACI'S horse. (71.)

u.  HELMS paid for some of STACI'S college education. (71.)

v.  She would not support her daughter STACI being an escort. (71.)

w.  Years ago CHANDRA HARMON was an escort and showed LISA THOMAS her website. (99.)

x. TAWNEY CALDWELL took photos for her escort site, yoursunshinetoday, at 9397 RIDINGS BLVD. (100, 102.)



y. TAWNEY had free access to the 9397 RIDINGS BLVD property. (105.)

z. She "was not okay for TAWNEY ever being an escort if she ever was." (105.)

aa. She testified: "I don't think it's ideal" to be an escort. (105.)

bb. "DISCREETLEE" was the name she used on her escort website. (107.)

cc. She advertised her escort services on "Eros." (107.)

dd. THOMAS started her escort website in 2006 or 2007. (108.)

ee. THOMAS did not file taxes on her income from 2007, explaining that most of the money was from HELMS. (108.)

ff. THOMAS did not file taxes for income from her escort services for 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, or 2017. (109.)

gg. She did not accept credit cards for either her escort services or Jan's Grooming. (110.)

hh. She has travelled out of the country escorting. (112.)

ii. She has travelled to China with HELMS. (113.)

jj. She used the WIC card to buy baby formula for TAWNEY'S daughter. (119.)

kk. She testified that she did not travel to Michigan to meet HELMS, "I met him in Ohio." (142.)

ll. She has never escorted out of her home. She would "go to a location, wherever I'm meeting someone if it's a restaurant, if it's a place." (143.)

mm. She has travelled out of state to provide escort services. (143.)

nn. She has travelled to Florida, China, California, Illinois, and Michigan. (144.)

oo. Sometimes she is paid at the beginning of a job, sometimes at the end. (144.)

pp. She is always paid in cash. (145.)

qq. She never puts money from escorting into the account for Jan's Grooming. (145.)

rr. As an escort, she had an hourly rate, and could negotiate a daily rate or if she went for a weekend or day or an hour. (146.)

ss. Her normal rate is $550 per hour. (146.)

tt. TAWNEY'S rates on her escort website were consistent, TAWNEY also charged $550 an hour. (147.)

uu. TAWNEY'S website listed $1,000 for 2 hours, and $5,000 for overnight. (147.)

vv. Her fee for 2 hours was also $1,000. Her rate was not $5,000 for an overnight; she did not have a particular overnight fee. (148.)

ww. She would negotiate a rate for weekends or extended periods of time like travelling to China. (148.)

xx. She did not keep track of who's paid and not because "you get either paid at the beginning or at the end so there's no – you don't have to wonder if someone paid." (148.)

yy. The email associated with her escort website is "discreetlee@aol. (149.)

zz. She provided escort services to HELMS up until sometime in 2016. (155.)

63.    STACI THOMAS also testified at the boys' custody hearing as follows:

a. The first year she was paid salary out of Jan's Grooming was 2018, when she was being paid $50,000. (230.)

b. The prior year, 2017, she was paid maybe $10,000. (230.)

c. She works mostly from home, but the number of hours is not substantial. (231.)

d. She does not take care of grooming pets, she takes care of payroll and manager duties. (231.)

e. The employees include Rhonda, Joanne and Zach; but she does not know their last names. (232.)

f. The employees write their own checks. (232.)

g. She has never worked as an escort or helped her mother with her escort business. (235.)

h. She used Jan's Grooming as her address on her Ohio driver's license. (255.)

i. LISA THOMAS is the only authorized check signor for Jan's Grooming. (260.)

j. STACI THOMAS could not provide the average price for grooming at Jan's Grooming, or the most that would be charged for grooming, or the most that has ever been charged, or the least amount of money charged for grooming because the amounts vary; or the number of clients, including whether they had more than 5 clients; what they do with their receipts because they don't typically give clients receipts; or the documents they gave the accountant to prepare taxes; or the amount of money received in 2017 including whether it was more than $100,000; or how often she makes deposits; or the amount of the deposits including whether it is more than $100 or $1,000; or the amount of the last deposit; or how much the employees make; how the employees are paid, such as hourly or weekly; what their schedules are because they all work all day everyday Jan's Grooming is open; or how long the employees have worked there. (271-286.)

k. STACI THOMAS was aware that her mother was an escort. (380.)

l. HELMS bought her a Warm Blood horse which typically costs around $40,000 and the horse HELMS bought probably cost more than $20,000. (382-383.)

64.    In an Affidavit filed in the civil litigation in support of her Motion for Summary Judgment, THOMAS swore under oath that:

    a.    She provided escort services to HELMS.

    b.    HELMS offered to buy her the house at 9397 RIDINGS BLVD and pay her $30,000 a month for her escort services;

    c.    The LLC was created for the purpose of carrying out the agreement with HELMS, concealing the agreement, and avoiding taxes; and

    d.    The LLC was not created as a legitimate business.

65.    Emails from HELMS indicate that HELMS did not like THOMAS providing escort services to other men.  He did not trust THOMAS when she said she only went to dinner but stayed out until 4:30 "watching a fight".  HELMS did not like THOMAS saying that she was going to spend 10 days at a client's vacation home and admitting "Yes I will sleep with him". HELMS did not like that THOMAS failed to tell him about her arrest for prostitution on February 17, 2009.

66.    On September 21, 2013, HELMS texted THOMAS: "What are you doing today? No Rolls yet had to put it on hold while [I] buy my lover a house!!!!  I would rather hold her hand than drive a rolls!  Not to mention that it's a lot more fun to ride her than in a Rolls!!!!  I would like to fuck her the Rolls!  To be honest I love fucking her!!!!

67.    On January 28, 2014, HELMS texted THOMAS "Your Money is in Your Account". THOMAS texted back a photo.

68.    THOMAS kept the following notes of the messages from HELMS:

| | |
|---|---|
| 01/20/14 | Your $ in your acct. |
| 10/08/14 | Wish married & F ing all night. You are my Pretty Woman! |
| 02/14/15 | Love ur P when F me |
| 06/02/15 | Screenshot |
| 08/29/15 | PP aka Platinum P…. |
| 09/08/15 | Need Platinum Pussy |
| 09/21/15 | Platinum Pussy |
| 09/24/15 | Platinum Pussy |

69.    Your Affiant is aware that Pretty Woman is the name of a movie in which a wealthy businessman picks up a prostitute on the street and pays her $3,000 to spend the weekend and have sex with him.

70.     THOMAS identified in her Answers to Interrogatories the following times she travelled for her escort services before she began providing exclusive escort services for HELMS:

| | |
|---|---|
| 06/--/07 | China two week trip |
| Pre2013 | Los Angeles California on several occasions (Beverly Wilshire) |
| Pre2013 | Fort Lauderdale, Florida on many occasions (Loews Hotel) |
| Pre2013 | Atlanta, Georgia on several occasions |
| Pre2013 | Detroit, Michigan many times (Somerset Inn) |
| Pre2013 | Toronto, Canada 2-3 times |

71.     Records obtained during the investigation confirm the following travel:

| | |
|---|---|
| 03/21/07 | THOMAS travel from Cincinnati Ohio to Toronto Canada |
| 03/22/07 | THOMAS travel from Canada to Cleveland Ohio |
| 03/22/07 | HELMS vehicle crossing into Detroit Michigan |
| 06/01/07 | THOMAS and HELMS travel Los Angeles CA to Narita Tokyo |
| 06/10/07 | THOMAS and HELMS travel Narita Tokyo to Los Angeles CA |
| 06/25/08 | THOMAS and HELMS cross into Detroit Michigan |

72.     THOMAS identified in her Answers to Interrogatories the following times she travelled after she began providing exclusive escort services to HELMS:

| | |
|---|---|
| November 20-21, 2013 | Detroit, Michigan |
| July 3, 2013 | Detroit, Michigan |
| July 6-7, 2013 | Detroit, Michigan |
| July 9, 2013 | Detroit, Michigan |
| July 13, 2013 | Detroit, Michigan |
| July 15, 2013 | Detroit, Michigan |
| August 2, 2013 | Detroit, Michigan |
| August 19, 2013 | Detroit, Michigan |
| August 28, 2013 | Detroit, Michigan |
| September 4, 2013 | Detroit, Michigan |
| September 10, 2013 | Detroit, Michigan |
| October 11, 2013 | Detroit, Michigan |
| October 13, 2013 | Detroit, Michigan |
| October 16-17, 2013 | Detroit, Michigan |
| October 25, 2013 | Detroit, Michigan |
| October 30, 2013 | Detroit, Michigan |
| November 6, 2013 | Detroit, Michigan |
| November 15, 2013 | Detroit, Michigan |
| November 20, 2013 | Detroit, Michigan |
| December 12, 2013 | Florida |
| January 9, 2014 | Detroit, Michigan |
| January 15, 2014 | Detroit, Michigan |
| February 27, 2014 | Detroit, Michigan |
| March 24, 2014 | Detroit, Michigan |

| | |
|---|---|
| April 1, 2014 | Detroit, Michigan |
| April 24, 2014 | Detroit, Michigan |
| May 12-13, 2014 | Detroit, Michigan |
| May 27, 2014 | Detroit, Michigan |
| June 10, 2014 | Detroit, Michigan |
| June 26, 2014 | Detroit, Michigan |
| July 17, 2014 | Detroit, Michigan |
| July 30, 2014 | Detroit, Michigan |
| August 14, 2014 | Detroit, Michigan |
| September 2, 2014 | Detroit, Michigan |
| September 16, 2014 | Detroit, Michigan |
| October 13, 2014 | Detroit, Michigan |
| October 25, 2014 | Detroit, Michigan |
| November 23, 2014 | Detroit, Michigan |
| December 17, 2014 | Detroit, Michigan |
| January 30, 2015 | Detroit, Michigan |
| February 22, 2015 | Detroit, Michigan |
| March 15, 2015 | Detroit, Michigan |
| April 18, 2015 | Detroit, Michigan |
| April 29, 2015 | Detroit, Michigan |
| May 14, 2015 | Detroit, Michigan |
| August 5, 2015 | Detroit, Michigan |
| September 23, 2015 | Detroit, Michigan |
| October 7, 2015 | Detroit, Michigan |
| November 24, 2015 | Detroit, Michigan |

73.     On the occasions THOMAS traveled to Michigan, after she began providing "exclusive escort services" for HELMS, she typically spent only one night in Detroit. She typically stayed at a hotel. Consequently, HELMS was paying THOMAS approximately $30,000 a month, and he got to see her for one night in a hotel.

74.     HELMS' wife lived in town. HELMS owned a small business, which his wife worked at and the employees knew his wife. It is reasonable to conclude that HELMS was not paying THOMAS to escort him to business functions. HELMS had two children, one of which still lived at home. HELMS was not lacking in companionship.

75.     Given that THOMAS swears that her relationship with HELMS was a "business relationship", that her contract with HELMS was to provide "exclusive escort services", that THOMAS was being paid approximately $30,000 a month to travel approximately one time per month to Michigan where she spent overnight in a hotel, and that she had sex with HELMS, your Affiant is unaware of any reason, other than sex, that HELMS was paying THOMAS $30,000 a month.

### C. **MONEY LAUNDERING VIOLATIONS**

76.     The proceeds of HELMS' Mann Act violations totaled in excess of $2,469,752. According to HELMS' allegations in the Complaint he filed to dissolve RIDINGS BOULEVARD PROPERTIES LLC that he paid THOMAS $1,709,876.41 which went toward the purchase, furnishing, utilities, maintenance, taxes and repair of 9397 RIDINGS BLVD. In addition, according to HELMS' allegations in the Motion for a Temporary Restraining Order, he paid an additional $759,876.41 to THOMAS, which $759,876.41 was deposited into the LLC'S bank account.

### **BANK ACCOUNTS**

77.     The IRS investigation revealed that HELMS and THOMAS used the following bank accounts:

     a. **CHASE BANK ACCT#****7690 originally in the name of GEORGE HELMS, then in the name of GEORGE HELMS and JOYCE HELMS;**

         (1) HELMS wrote checks to cash from this account that were deposited in STACI THOMAS' PNC account #1704.

         (2)  No deposits were made after HELMS ended his relationship with THOMAS.

     b. **PNC BANK ACCT# ******0367 BUSINESS CHECKING ACCOUNT in the name of R BOULEVARD PROPERTIES LLC;**

         (1.) The LLC's account was opened on October 11, 2013, shortly before the LLC purchased the 9397 RIDINGS BLVD property.

         (2.) The authorized signors are HELMS and THOMAS.

         (3.) The deposits into this account consisted of deposits made from HELMS' Chase account.

         (4.) There are no rent payments made into this account.

         (5.)  During the time period of 10/11/2013 through 3/30/2016, numerous checks were written and withdrawals were made from this account by THOMAS for personal living expenses.

         (6.) The deposits into this account in 2017 are less than $10.00.

         (7.) The ending balance on December 29, 2017 is zero ($0.00) dollars.

   c. **PNC BANK ACCT#\*\*\*\*\*\*0652 in the name of GEORGE HELMS;**

      (1.) HELMS' PNC account was opened in February 2016, around the time his wife filed for divorce;

      (2.) HELMS has a direct deposit of $500 per month into this account from a company identified herein as AEC. *(HELMS is the chairman and CEO of AEC since 1987. AEC is headquartered in Redford, Michigan and has locations in the northern Ohio area to serve customers throughout North America. Since 1922, AEC offers deep drawn metal stamping services for customers in the automotive, home hardware, medical, electronics and food industries. )*

      (3.) HELMS made the following large deposits into his PNC Account #0652:

| | |
|---|---|
| 02/18/16 | $50,000.00 |
| 04/15/16 | $14,000.00 |
| 06/20/16 | $50,000.00 |
| 04/24/18 | $12,317.69 |

   d. **PNC BANK ACCT# \*\*\*\*\*\*6723 CHECKING ACCOUNT in the name of LISA THOMAS;**

      (1.) Multiple deposits made into this account in 2011 and 2012 were transfers from PNC Account #1704 which is the custodial savings account the THOMAS had for STACI;

      (2.) Additional deposits were made into this account from an individual identified herein as "T.B." as follows:

| | |
|---|---|
| 06/13/11 | $4,500 |
| 01/03/12 | $4,500 |
| 01/24/12 | $2,500 |
| 03/07/12 | $4,500 |
| 03/26/12 | $4,500 |
| 09/24/12 | $4,500 |
| 03/17/13 | $3,500 |

      (3.) Prior to opening the R BLVD PROPERTIES LLC PNC Account #0367, two $80,000 deposits were made into this account on 08/15/13 and 08/20/13;

      (4.) The deposits into this account in 2017 are less than $3,500 for the year.

    e. **PNC BANK ACCT# ******3571 BUSINESS CHECKING ACCOUNT in the name of JAN'S GROOMING;**

        (1.) The deposits into this account in 2017 average approximately $9,000 a month.

        (2.) The withdrawals do not support THOMAS' testimony that she was paid $50,000 a year from the business.

    f. **PNC BANK ACCT# ******1704 SAVINGS ACCOUNT in the name of STACI THOMAS, LISA R THOMAS CUSTODIAN;**

        (1.) THOMAS made multiple deposits into this account that came from HELMS. Then she typically transferred those funds into her PNC Acct #6723.

        (2.) The deposits into this account in 2017 (after THOMAS stopped doing business with HEMS) are less than $2,000 for the year.

## FINANCIAL TRANSACTIONS

78.    The following financial transactions were conducted:

    a. On or about 10/11/2013, a deposit of $950,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter;

    b. On or about 10/15/2013, a withdrawal of $922,699.15 was made by THOMAS from PNC Bank account 0367, R BOULEVARD PROPERTIES LLC.

    c. On or about 10/18/2013, a deposit of $23,525 was made into account was made into PNC Bank account 0367, by way of a cashier's check from Wright Patt Credit Union and it was to the order of Lisa Thomas Re: John B. Terry 30 E. Apple Street, Suite 6257, Dayton, OH 45409. *(According to a healthcare website, Dr. Terry is a medical doctor, specializing in neurology, vascular and interventional radiology for 28 years.)*

    d. On 01/28/2014, a deposit of $80,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

    e. On or about 04/25/2014, a deposit of $80,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

    f. On or about 06/18/2014, a deposit of $50,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

g. On or about 07/18/2014, a deposit of $50,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

h. On or about 09/09/2014, a deposit of $50,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

i. On or about 11/13/2014, a deposit of $50,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

j. On or about 01/21/2015, a deposit of $50,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

k. On or about 03/03/2015, a deposit of $37,719.40 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a check from a company identified herein as "AEC" made payable to HELMS. On or about 04/08/2015, a deposit of $35,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

l. On or about 06/10/2015, a deposit of $35,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

m. On or about 07/15/2015, a deposit of $15,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

n. On or about 08/03/2015, a deposit of $35,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

o. On or about 09/14/2015, a deposit of $25,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

p. On or about 10/27/2015, a deposit of $30,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

q. On or about 12/15/2015, a deposit of $35,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

r.  On or about 12/18/2015, a deposit of $35,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

s.  On or about 02/13/2016, a deposit of $25,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a cashier's check from Chase Bank with HELMS as the remitter.

t.  On or about 03/16/2016, a deposit of $10,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a check from PNC Bank with HELMS as the remitter.

u.  On or about 03/25/2016, a deposit of $5,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a check from PNC Bank with HELMS as the remitter.

v.  On or about 04/04/2016, a deposit of $3,000 was made into PNC Bank account 0367, R BOULEVARD PROPERTIES LLC, by way of a counter check from PNC Bank account 4305916723 with THOMAS as the remitter.

79.  HELMS checks to the LLC total approximately $1,682,719.40.

80.  HELMS stopped paying THOMAS after his wife filed for divorce in 2016.

### D. **TAX VIOLATIONS**

81.  THOMAS has failed to report any payments for her escort services on the tax returns that she filed.

82.  Your Affiant has verified that payments of approximately $1,682,719.40 were paid by HELMS into the LLC's bank account and at least an additional $400,000 was paid by HELMS IN Chase Bank checks  payable to himself, cash or LISA THOMAS, which was not deposited into the LLC's bank account.

83.  THOMAS failed to report HELMS' payments well in excess of $1,000,000 as income from her escort service on her 2013, 2014, 2015, 2016 and 2017 tax returns.

84.  HELMS did not report any of his alleged payments of $1,709,876.41 as a gift to LISA THOMAS.

## IV. FORFEITURE

A. **Net Proceeds due to the Sellers of the Real Property located at 9397 RIDINGS BOULEVARD, Centerville, Ohio ("Love Nest")**

85.     HELMS and THOMAS created R BOULEVARD PROPERTIES LLC for the purpose of making payments to THOMAS for her exclusive escort services; to conceal the home from his wife; to transfer the home to THOMAS as payment for her exclusive escort services; and to avoid gift tax.

86.     HELMS deposited $950,000 into the R BOULEVARD PROPERTIES LLC account on October 11, 2013.

87.     The $950,000 deposit came from HELMS personal bank account.

88.     On October 30, 2013, HELMS and THOMAS purchased the residence located at 9397 RIDINGS BOULEVARD, CENTERVILLE OHIO, pictured below, for $925,000.



89.     THOMAS lived at 9397 RIDINGS BLVD from November 2013 through July 2016.

90.     The real property is being sold for $790,000.

91.     The closing is scheduled for December 20, 2018.

92.     The Net Proceeds due to the Sellers of the Real Property located at 9397 Ridings Boulevard, Centerville Ohio, 45458 are subject to forfeiture as proceeds of the Mann Act violation, as property that facilitated the Mann Act violation, and as property involved in money laundering.

## CONCLUSION

93.    Based on the above information, your affiant believes that probable cause exists that:

    a.     The following violations have been committed:

    (1) 18 U.S.C. § 2422(a) (Mann Act);

    (2) 18 U.S.C. § 1956 (Money Laundering);

    (3) 18 U.S.C. § 1957 (Money Laundering (Spending));

    (4) 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering); and

    (5) 26 U.S.C. § 7201 (Tax Evasion);

    (6) 26 U.S.C. § 7202 (False Tax Return);

    (7) 26 U.S.C. § 7203 (Failure to File, Pay Tax);

    b.     and the Net Proceeds of the Sale of 9397 Ridings Boulevard is subject to forfeiture pursuant to:

    (1) 18 U.S.C. § 981(a)(1)(C)(civil forfeiture) as property, real or personal which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity" ("SUA") as defined in 18 U.S.C. § 1956(c)(7) which includes a violation of 18 U.S.C. § 2422(a)(Mann Act); 18 U.S.C. § 1956 (Money Laundering), 18 U.S.C. § 1957 (Laundering SUA Proceeds in Excess of $10,000.00); or a conspiracy to commit such offense;

    (2) 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)(criminal forfeiture) as property, real or personal which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7) which includes a violation of 18 U.S.C. § 2422(a)(Mann Act); 18 U.S.C. § 1956 (Money Laundering), 18 U.S.C. § 1957 (SUA Transactions in Excess of $10,000.00); or a conspiracy to commit such offense ;

    (3) 18 U.S.C. § 2428(a)(1) (criminal forfeiture) as property, real or personal that was used or intended to be used to commit or to facilitate the commission of a violation of 18 U.S.C. § 2422(a);

    (4) 18 U.S.C. § 2428 (a)(2) (criminal forfeiture) as property, real or personal, constituting or derived from any proceeds that such person obtained, directly or indirectly, as a result of a violation of 18 U.S.C. § 2422(a);

(5) 18 U.S.C. § 2428(b)(1)(civil forfeiture) as property, real or personal used or intended to be used to commit or to facilitate the commission of a violation of 18 U.S.C. § 2422(a); and

(6) 18 U.S.C. § 2428(b)(2) (civil forfeiture) as property, real or personal, that constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 2422(a).

Your Affiant further sayeth naught.

Kenny D. Howard
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 19th day of December, 2018

Michael Newman
U.S. Magistrate Judge